[Cite as *State v. Heald*, 2025-Ohio-3031.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2025-L-010 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| MARCUS E. HEALD, | |
| Defendant-Appellant. | Trial Court No. 2024 CR 001146 |

## OPINION AND JUDGMENT ENTRY

Decided: August 25, 2025
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Jennifer A. McGee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Brian A. Smith*, Brian A. Smith Law Firm, LLC, 123 South Miller Road, Suite 250, Fairlawn, OH 44333 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, Marcus E. Heald, appeals the judgment of conviction from the Lake County Court of Common Pleas after a jury trial where he was convicted on one count of felony Domestic Violence, one count of Strangulation, and four counts of Violating a Protection Order.

{¶2} Appellant has raised four assignments of error arguing: (1) his conviction was against the manifest weight of the evidence; (2) the trial court erred by failing to merge Domestic Violence under Count One with Strangulation under Count Two, as they were allied offenses of similar import; (3) a defect in the verdict form on Count One

resulted in a violation of his due process and trial by jury rights; and (4) the trial court's decision to send the verdict form for Count One back to the jury after the jury had reached a verdict violated his due process and trial rights, including double jeopardy protections.

{¶3} Having reviewed the record and the applicable caselaw, we find Appellant's assignments of error are without merit. Appellant's convictions were not against the manifest weight of the evidence, and the trial court did not err in failing to merge the Domestic Violence count with the Strangulation count. Finally, Appellant did not object to the trial court correcting an apparent error on the verdict form for Count One and then instructing the jury to complete the new form. Appellant cannot demonstrate plain error as a result of this action.

{¶4} Therefore, the judgment of the Lake County Court of Common Pleas is affirmed.

**Substantive and Procedural History**

{¶5} On October 25, 2024, Appellant was indicted by the Lake County Grand Jury on the following counts: Count One, Domestic Violence, a third-degree felony in violation of R.C. 2919.25(A); Count Two, Strangulation, a third-degree felony in violation of R.C. 2903.18(B)(2); Count Three, Strangulation, a fourth-degree felony in violation of R.C. 2903.18(B)(3); and Counts Four, Five, Six, and Seven, Violating a Protection Order, first-degree misdemeanors in violation of R.C. 2919.27(A)(1). Appellant pled not guilty.

{¶6} On September 19, 2024, the matter proceeded to jury trial. The following facts and evidence were adduced at trial:

{¶7} The parties stipulated to the admission of two certified prior convictions against Appellant for Domestic Violence.

{¶8}   The State called Susan Furman, a 911 Dispatcher with the Lake County Sheriff's Office. She said that she received an emergency call on September 19, 2024, from a male caller saying that a minor had been assaulted. The caller and another individual who identified himself as Randolph Riley both spoke to Furman to provide details of the assault. Riley told Furman that Appellant was the individual who committed the assault. He also stated that the minor had injuries to her neck, saying it was "all bruised up and stuff."

{¶9}   Crystal Scheibelhoffer called 911 at the same time and was routed to another dispatcher. On that call, Scheibelhoffer said Appellant had "put his hands on my 15-year-old-daughter[.]"

{¶10}   The State introduced both calls as exhibits.

{¶11}   Scheibelhoffer, her oldest daughter, M.P., Alisha Petit, and James Aquila testified as witnesses to Appellant's violence against M.P. Appellant and Scheibelhoffer had been in a romantic relationship for about six years, and Scheibelhoffer and her children lived with Appellant for about three years. M.P. testified that she was 16 years old on September 19, 2024.

{¶12}   Petit and Acquila went to Appellant's house on September 19, 2024, to help Scheibelhoffer and her children move their things out of the house. They arrived around 10:30 p.m. After they arrived, M.P. said she needed to go back into the house to get some of her personal effects. Appellant responded that M.P. was not allowed back in the house. M.P. and Appellant were both on the porch, and when Appellant would not let her enter, M.P. said, "Watch me," and went through a window on the porch. Appellant went inside to stop M.P. from entering any further.

Case No. 2025-L-010

{¶13}  M.P. testified that Appellant stood in front of her and then "kick[ed] one foot out from underneath of me and grabbed me by the neck and kind of holds it." She said that he used his wrist, "locked it in" around her neck, and "was squeezing." M.P. said that he pulled on her and lifted her up as she struggled with him and that she was "kind of up on my tippy toes" as he pulled her backwards.

{¶14}  Scheibelhoffer testified that Appellant had his arm around M.P.'s neck and that "her chin was elevated . . . , she was on her tippy toes, and her face was beet red as she was fighting to get air." Aquila testified that Appellant got behind M.P. and put "his arm around her neck. . . . Positioned almost like a chokehold." Petit testified that Appellant came up behind M.P. in the doorway and put his arm around her neck in a chokehold. She said that others at the scene had to restrain Appellant and fell into a china cabinet.

{¶15}  Petit checked on M.P. and noticed that her breathing was "a little bit labored." She said that M.P. had red marks on the left side of her neck "from being restrained" that looked like a rash. Petit also testified that M.P. had red marks on her left arm. Petit took pictures of the marks, which the State introduced as exhibits. Scheibelhoffer said M.P. was "panting" from being strangled.

{¶16}  M.P. testified that she has asthma and that, after being choked, was having trouble breathing and needed to use an inhaler. She said that, in addition to the visible marks on her neck and arm, she noticed bruises on both of her legs after taking off the leggings she had been wearing.

{¶17}  Deputy Charles Gaylog, of the Lake County Sheriff's Office, testified that he noted redness and what he thought were broken blood vessels on M.P.'s neck and redness on her left arm.

Case No. 2025-L-010

{¶18} Appellant was arrested and held in the Lake County Jail.

{¶19} On September 23, 2024, the following Monday, Scheibelhoffer and M.P. went to court to obtain a restraining order against Appellant. The court granted an ex parte order against Appellant prohibiting him from making contact with Scheibelhoffer and her children. Deputy David Doughty, of the Lake County Sheriff's Office, testified that he served Appellant with the ex parte protection order in the county jail on September 23, 2024, at 4:36 p.m.

{¶20} Following this, a full hearing was held, and the court granted a Domestic Violence Civil Protection order against Appellant prohibiting him from making contact with Scheibelhoffer and her children for a period of five years.

{¶21} Scheibelhoffer said that Appellant called her from jail on September 23, 2024, after she had received the ex parte protection order. Appellant also called Scheibelhoffer numerous times from the jail on September 28, 2024. Appellant again called Scheibelhoffer on September 30, 2024. In one call Appellant made to another individual, Appellant said that he could call Scheibelhoffer by using other inmates' call PINs. Scheibelhoffer received calls originating from the Lake County Jail that used telephone PINs from other inmates on October 6, 2024. Scheibelhoffer said that she did not know the inmates associated with the PINs that made the calls to her. Scheibelhoffer did not accept any of the calls within these date ranges.

{¶22} However, Scheibelhoffer answered one of Appellant's calls on October 12, 2024. Appellant asked her to give a message to M.P., and Scheibelhoffer told Appellant there was a protection order in place, which he acknowledged.

{¶23} In addition, Appellant sent two letters to Scheibelhoffer and had some of his friends and family members contact her on his behalf.

{¶24} The State introduced jail call audio recordings, jail call phone records, and screenshots of text messages supporting Scheibelhoffer's testimony that Appellant made contact with her while he was in the Lake County Jail. In multiple recordings, Appellant referenced his awareness of the protection order and expressed that he did not intend to comply with it.

{¶25} The jury found Appellant guilty on all counts.

{¶26} On January 3, 2025, the trial court sentenced Appellant.

{¶27} The State argued that Count One was a separate offense from Counts Two and Three but said that Counts Two and Three should merge for sentencing. Appellant argued that all three counts should merge for sentencing purposes because they arose out of the same course of action. The State argued that Count Two was a distinct charge specifically contemplating Appellant's harm to the throat or neck area and that there were "more injuries than that from the incident," including the "bruising on legs and arms," which would justify separate convictions on Count One for Domestic Violence and Count Two for Strangulation. The trial court did not Merge Count One with Counts Two and Three, but it did merge Counts Two and Three for sentencing purposes. The State requested that the trial court sentence Appellant on Count Two.

{¶28} The trial court sentenced Appellant to 30 months in prison on Count One; 30 months in prison on Count Two; and 180 days in jail on Counts Four, Five, Six, and Seven. The trial court ordered the sentences be served concurrently to each other.

{¶29} Appellant timely appealed raising four assignments of error.

Case No. 2025-L-010

**Assignments of Error and Analysis**

{¶30}  Appellant's first assignment of error states: "Appellant's convictions were against the manifest weight of the evidence."

{¶31}  When evaluating the weight of the evidence, we review whether the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other indicated clearly that the party having the burden of proof was entitled to a verdict in its favor, if, on weighing the evidence in their minds, the greater amount of credible evidence sustained the issue which is to be established before them. *State v. Thompkins*, 1997-Ohio-52, ¶ 24. "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis deleted.) *Id*. Whereas sufficiency relates to the evidence's adequacy, weight of the evidence relates the evidence's persuasiveness. *Id.*

{¶32}  The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 2021-Ohio-4258, ¶ 22 (11th Dist.); *State v. Antill*, 176 Ohio St. 61, 67 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, his or her interest, if any, in the outcome of the case, and his or her connection with the prosecution or the defendant. *Landingham* at ¶ 22*.* This Court, engaging in the limited weighing of the evidence introduced at trial, is deferential to the weight and factual findings made by the factfinder. *State v. Brown*, 2003-Ohio-7183, ¶ 52 (11th Dist.). The reviewing court "determines whether . . . the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. The discretionary power to grant a new trial should be exercised only

Case No. 2025-L-010

in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶33} A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 2013-Ohio-1842, ¶ 32 (11th Dist.).

**Domestic Violence:**

{¶34} R.C. 2919.25(A) provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Two prior convictions for Domestic Violence raises the offense level to a third-degree felony. R.C. 2919.25(D)(4). R.C. 2919.25(F)(1) defines the term "family or household member" to mean any of the following:

(a) Any of the following who is residing or has resided with the offender:

(i) A spouse, a person living as a spouse, or a former spouse of the offender;

(ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender;

(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender.

(b) The natural parent of any child of whom the offender is the other natural parent or is the putative other natural parent.

{¶35} A "person living as a spouse" means "a person who is living or has lived with the offender in a common law martial relationship, who otherwise is cohabitating with the offender, or who otherwise has cohabitated with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2).

Case No. 2025-L-010

{¶36} Although the term "cohabitation" is not statutorily defined, Ohio common law has held that cohabitation can be demonstrated by "(1) sharing of familial or financial responsibilities and (2) consortium." *State v. Williams*, 1997-Ohio-79, ¶ 14.

{¶37} In this case, the evidence established that M.P. was a child of Scheibelhoffer and that Scheibelhoffer was a person living as a spouse with Appellant. Scheibelhoffer testified that she shared familial and financial responsibilities and was in a romantic relationship with Appellant. The two shared a residence and slept in the same room. This relationship satisfied the definition of family or household member as provided in R.C. 2919.25(F)(1)(a)(iii).

{¶38} Further, the evidence established that Appellant and M.P. argued about whether she could enter the house. M.P. entered through the window, and Appellant approached her inside the house. M.P. said that Appellant "kick[ed] one foot out from underneath of me and grabbed me by the neck and kind of holds it." In doing so, Appellant caused injuries to M.P.'s leg. M.P. testified that she had bruising on her leg, which she discovered later after taking off her leggings. Finally, the parties stipulated that Appellant had two prior convictions for Domestic Violence.

**Strangulation:**

{¶39} Appellant was convicted on R.C. 2903.18(B)(2), which provides that: "No person shall knowingly . . . [c]reate a substantial risk of serious physical harm to another by means of strangulation or suffocation[.]" A "substantial risk" means "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶40} "Serious physical harm to persons" means any of the following:

Case No. 2025-L-010

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶41} The degree of harm that constitutes "serious physical harm" is normally a matter of weight rather than sufficiency of the evidence. *State v. Sanabria*, 2019-Ohio-2869, ¶ 15 (11th Dist.). The serious physical harm element can be reasonably inferred "[w]here injuries to the victim are serious enough to cause him or her to seek medical treatment." *State v. Wilson*, 2000 WL 1369868, *5 (8th Dist. Sept. 21, 2000); *Sanabria*, 2019-Ohio-2869, ¶ 15 (11th Dist.). However, the exact level of harm required to establish serious physical harm "is not an exact science[.]" *State v. Irwin*, 2007-Ohio-4996, ¶ 37 (7th Dist.); *Sanabria*, 2019-Ohio-2869, ¶ 15 (11th Dist.).

{¶42} In *Sanabria* we set forth several examples of case law that this Court has relied on to support finding serious physical harm: *State v. Thomas*, 2015-Ohio-5247, ¶ 23 (9th Dist.) (where the victim was hit in the eye with a close fist, described the level of pain as a ten on a scale of one to ten, and had difficulty seeing); *State v. Bowden*, 2014-Ohio-158, ¶ 9 (11th Dist.) (where the victim suffered multiple hematomas, a broken nose, and cervical sprain); *State v. Phillips*, 2006-Ohio-6909, ¶ 16 (9th Dist.) (where the victim experienced facial bruising and swelling and an orbital fracture); *State v. Worrell*, 2005-

Ohio-1521, ¶ 18, 50 (10th Dist.) (where the victim "sustained extensive bruising on her lower back and hip" that took up to six weeks to heal). *Sanabria* at ¶ 16.

{¶43} In certain circumstances, bruising can constitute serious physical harm. *Worrell* at ¶ 49; *State v. Barbee*, 2004-Ohio-3126, ¶ 60 (8th Dist.); *State v. Burdine-Justice*, 125 Ohio App.3d 707, 714-715 (12th Dist. 1998); *State v. Krull*, 2003-Ohio-4611, ¶ 23 (12th Dist.). Further, rendering a victim unconscious is "sufficient to establish the element of serious physical harm. *In re Miller*, 2002-Ohio-3360, ¶ 28 (11th Dist.). The evidence supported a finding of serious physical harm where the victim was put in a "sleeper hold," lost consciousness, and was viciously beat with blows to the midsection and multiple kicks to the head. *State v. Magnusson*, 2007-Ohio-6010, ¶ 25 (11th Dist.).

{¶44} In *Sanabria* we found that the trial court erred in granting a motion for acquittal on a felonious assault count where the victim suffered acute pain resulting in body wide injuries including abrasions on her arm, a swollen nose, and a red mark on her head from where she was struck by a gun and where the victim continued to suffer from headaches and neck pain. *Id.* at ¶ 13-14, 16.

{¶45} In *State v. Osborne*, 2024-Ohio-2173 (8th Dist.), the Eighth District determined the evidence supported a finding of serious physical harm after the defendant strangled the victim with a towel and violently shook her head. *Id.* at ¶ 23. The victim had a raspy throat six days later, bruising, discomfort in her shoulder, increased anxiety, and trouble sleeping. *Id.*

{¶46} The court noted that strangulation does not necessarily cause a substantial risk of serious physical harm. *Id.* at ¶ 24. However, in *Osborne*, the court found the record demonstrated that the defendant "created a substantial risk of serious physical harm to

Case No. 2025-L-010

[the victim] when he placed a towel around her neck, strangled her, violently shook her head, and pushed her into the bathroom door." *Id.* at ¶ 25. Further, the victim sought medical treatment six days later for her continued soreness, raspy throat, and anxiety issues, which helped to establish the seriousness of her physical harm. *Id.* at ¶ 28.

{¶47} In *State v. Williams*, 2024-Ohio-5578 (5th Dist.), the victim was strangled and suffered "visible injuries including edema and swelling of her jaw and scattered ecchymosis and erythema of her neck, as well as contusions, bruising, and abrasions on her head, neck, chest, jaw, and ear. . . . [H]er jaw was numb for over two months," and her pain level was a seven out of ten. *Id.* at ¶ 55. The victim received CAT scans and angiograms as part of her medical treatment "due to the location of her injuries." *Id.* The Fifth District determined this evidence did support the jury's finding that the defendant created a substantial risk of serious physical harm to the victim. *Id.* at ¶ 57.

{¶48} In this case, the evidence at trial established that Appellant used his arm to place M.P. in a chokehold and to strangle M.P. He did so while standing behind her, dragging her back, and pulling her up on her "tippy toes." M.P. did not lose consciousness but did say that she was concerned that she could pass out.

{¶49} After Appellant strangled M.P., witnesses said that her breathing was "labored" and described her as "panting." Witnesses noted red marks on the side of her neck, with one witness describing the redness as a rash and another witness describing the redness as possibly broken blood vessels. All witnesses indicated that the redness they saw in person appeared more severe than the redness seen in the pictures of M.P.'s injuries. M.P. also had bruising on her arm that was caused by Appellant's act of strangulation. That bruising represents the greater harm M.P. could have suffered from

the strangulation and the substantial risk of serious physical harm that Appellant created by strangling M.P.

{¶50} Although M.P. declined to be transported for medical treatment, M.P. also said that she suffered from asthma and had to use an inhaler to help with her troubled breathing after being strangled. Appellant knew that M.P. had asthma and nevertheless cut off her breathing until, as Sheibelhoffer described, M.P.'s face turned "beet red as she was fighting for air."

{¶51} Based on the testimony and evidence, the State is entitled to its verdict on Count Two.

**Violating a Protection Order:**

{¶52} R.C. 2919.27(A)(1) provides that no person shall violate the terms of a protection order issued pursuant to R.C. 2919.26 or 3113.31.

{¶53} Sheibelhoffer obtained an ex parte Domestic Violence Civil Protection Order pursuant to R.C. 3113.31 on September 23, 2024. That ex parte order was served on Appellant on September 23, 2024, at 4:36 p.m. in the Lake County Jail. Scheibelhoffer next received a five-year Domestic Violence Civil Protection Order on October 3, 2024.

{¶54} Trial testimony established that Appellant made repeated attempts to contact Scheibelhoffer from the Lake County Jail, including calling her phone from his inmate telephone PIN on September 23, 2024, September 28, 2024, and September 30, 2024. Appellant also used other inmates' PINs in attempts to contact Scheibelhoffer on October 6, 2024. Scheibelhoffer answered Appellant's phone call on October 12, 2024, and spoke to him.

{¶55} In addition, Appellant sent two letters to Scheibelhoffer and enlisted the help of friends to make third-party contact with Scheibelhoffer in order to pass messages along to her. Appellant's jail call recordings established that he was aware that Scheibelhoffer had obtained a protection order against him.

{¶56} Appellant's convictions for Violating a Protection Order are not against the manifest weight of the evidence.

{¶57} Accordingly, Appellant's first assignment of error is without merit.

{¶58} Appellant's second assignment or error states: "The trial court erred in failing to merge Count One, Domestic Violence, with Counts Two and Three, Strangulation, for purposes of sentencing, where Counts One, Two, and Three were allied offenses of similar import pursuant to R.C. 2941.25, in violation of Appellant's right against Double Jeopardy under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution."

{¶59} While the defendant bears the burden of establishing entitlement to having offenses merged under R.C. 2941.25, an appellate court conducts a de novo review of the trial court's decision regarding merger of offenses. *State v. Frost*, 2020-Ohio-6920, ¶ 10 (11th Dist.).

{¶60} R.C. 2941.25, Ohio's merger statute, provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

Case No. 2025-L-010

{¶61} Offenses of dissimilar import exist "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *State v. Ruff*, 2015-Ohio-995, paragraph two of the syllabus. "Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus.

{¶62} The Supreme Court of Ohio explained that when considering merger,"[a] trial court and the reviewing court on appeal . . . must first take into account the conduct of the defendant. In other words, how were the offenses committed?" *Id.* at ¶ 25.

> If *any* of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.

(Emphasis added.) *Id.*

{¶63} "An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *Id.* at ¶ 31.

{¶64} Where a defendant's conduct harms more than one person, the harm to each person is separate and the defendant can be convicted on multiple counts. *Id*. at ¶ 26. "[A] defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.*

{¶65} The Ohio Supreme Court recognized that analyzing whether offenses are of dissimilar import "'may be sometimes difficult to perform and may result in varying results for the same set of offenses in different cases. But different results are permissible, given that the statute instructs courts to examine a defendant's conduct – an inherently subjective determination.'" *Id.* at ¶ 32, quoting *State v. Johnson*, 2010-Ohio-6314, ¶ 52 (plurality opinion per Brown, C.J.).

{¶66} "The key to legislative intent from use of the words 'allied offenses of similar import' in R.C. 2941.25(A), and 'offenses of dissimilar import,' in R.C. 2941.25(B), arises in great part from the word 'import,' which by dictionary definition would have reference to 'allied offenses' of similar importance, consequence and signification intended from use of the word 'import.'" *State v. Baer*, 67 Ohio St.2d 220, 226 (1981).

{¶67} The Tenth District has helpfully discussed the meaning of "animus" in light of the Supreme Court of Ohio's evolving case law on the issue of merger:

> The Court has also defined "animus" as "'purpose, intent, or motive.'" *Newark v. Vazirani*, 48 Ohio St.3d 81, 84 (1990)[1], quoting *State v. Blankenship*, 38 Ohio St.3d 116, 119 (1988) (Whiteside, J., concurring); *see also Black's Law Dictionary* 107 (10th Ed.2014) (defining "animus" in relevant part as "[i]ntention").

*State v. Smith*, 2019-Ohio-5199, ¶ 16 (10th Dist.).

{¶68} In footnote 1, the Tenth District observed:

> *Vazirani* was overruled on other grounds by *State v. Rance*, 85 Ohio St.3d 632, 637 (1999) which has, itself, been overruled by a line of cases culminating in *Ruff*. *See State v. Johnson*, . . . 2010-Ohio-6314; [*State v.*] *Williams*, 2012-Ohio-5699; *Ruff*, 2015-Ohio-995. Despite the many revisions of allied offenses law, there is no indication that the Supreme Court has altered the definition of "animus."

*Id.* at ¶ 16, fn. 1.

Case No. 2025-L-010

{¶69} In *State v. McQueen*, 2025-Ohio-1123 (12th Dist.), the Twelfth District determined that the offenses of Abduction and Strangulation did not merge because, although "the offenses occurred close in time to one another, they were committed separately." *Id.* at ¶ 17. "As this court has previously recognized, 'if one offense is completed before the other begins, the offenses are considered separately for sentencing purposes even though the two offenses may have been committed in close proximity in time.'" *Id.*, quoting *State v. Fields*, 2015-Ohio-1345, ¶ 18 (12th Dist.).

{¶70} In *State v. Wilson*, 2025-Ohio-2296 (3d Dist.), the State conceded that counts of Strangulation and Domestic Violence were allied offenses of similar import because the conduct "'arose out of a single act with a single animus, and with a single victim.'" *Id.* at ¶ 25.

{¶71} The State argues that Appellant's conduct constituting the separate offense of Domestic Violence was "satisfied when Appellant kicked M.P.'s foot out from underneath her. As a result of the domestic violence, M.P. sustained bruises to her leg and arm. The conduct necessary to sustain Appellant's conviction for strangulation was satisfied when Appellant put his arm around M.P.'s neck making it difficult for her to breath."

{¶72} There was evidence to support that the animus for both offenses was the same—to get M.P. out of the house. Next, there was insufficient evidence to demonstrate that the offenses were committed separately. Given the testimony, we cannot say whether the offenses were or were not committed separately. But what we do know is that the offenses were of dissimilar import or significance in that each of the offenses caused separate and identifiable harm: namely, a bruised leg and an injured throat. In plain terms,

Case No. 2025-L-010

the kick did not injure M.P.'s throat, and the strangling did not injure her leg. The first offense of Domestic Violence was complete and produced the separate and identifiable harm of bruising M.P.'s leg. The second offense of Strangulation need not have necessarily followed from the first offense and constituted a separate offense where Appellant engaged in the specific acts necessary to complete the offense of Strangulation. The testimony indicated that Appellant got behind M.P., put her in a chokehold, and was dragging her back and pulling her up on to her "tippy toes" while cutting off her breathing. Those acts produced a separate and identifiable harm distinct from the first offense. Therefore, because Appellant's offenses satisfied at least one of the three necessary conditions set forth in *Ruff*, the trial court did not err in determining that the offenses should not merge.

{¶73} Accordingly, Appellant's second assignment of error is without merit.

{¶74} For ease of discussion, we address Appellant's third and fourth assignments of error together.

{¶75} Appellants third assignment of error states: "Appellant's convictions, particularly on Count One of the Indictment, Domestic Violence, a third-degree felony, violated R.C. 2945.75(A)(2), as well as Appellant's rights to Due Process and to trial by jury under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 5, 10, and 16 of the Ohio Constitution, due to the error in the verdict form, which failed to include a statement that the aggravating element of prior charges and/or convictions for Domestic Violence had been found, which was required to convict Appellant of third-degree felony Domestic Violence."

{¶76} Appellant's fourth assignment of error states: "The trial court's decision to send the verdict form, for Count One of the Indictment, back to the jury, after a verdict had been reached and returned to the trial court, violated Appellant's rights to Due Process and to trial by jury and constituted plain error, and violated Appellant's right against Double Jeopardy, under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 5, 10, and 16 of the Ohio Constitution, and constituted a violation of law under R.C. 2945.78 and 2945.79."

{¶77} In his third assignment of error, Appellant argues that the jury's verdict form contained an error on Count One and that the trial court erred when it instructed the jury to resume deliberations after discovering the error. In his fourth assignment of error, Appellant argues that the trial court violated his rights against double jeopardy by instructing the jury to resume deliberations.

{¶78} "[O]rdinarily, failure to object to a jury instruction or verdict form constitutes waiver of any error for appeal." *State v. Lacey*, 2006-Ohio-4290, ¶ 33 (5th Dist.). Even where there is an error in the wording of the verdict form, a defendant must demonstrate plain error affecting the outcome of the trial. *State v. Mays*, 2024-Ohio-4616, ¶ 18. Where the language in the verdict form fails to state the degree of the offense or additional elements, "[t]he finding in the verdict cannot be described as error, let alone an obvious defect in the trial proceedings, and it did not affect [the defendant's] substantial rights." *State v. Eafford*, 2012-Ohio-2224, ¶ 18. Failing to object to a potential defect in a verdict form and failure to show that "but for the use of the verdict form, the outcome of the trial would have been different" is a failure to demonstrate plain error. *Id.*

{¶79} Appellant did not object to any error in the verdict form and did not object to the jury returning to deliberate after the trial court noted an error in the verdict form on Count One. Therefore, he must demonstrate that the outcome of the trial would have been different but for the use of the verdict form.

{¶80} The transcript indicates that the foreperson handed the verdict forms to the trial court and the trial court began to read the verdict. However, the trial court stopped and said, "[i]n the additional finding as to Count 1 -- we have an error. We'll reprint out Count 1 *so I do that correctly*. So I'm going to return this to the jury, and you can complete the official finding in Count 1." (Emphasis added). The jury then left the courtroom and later re-entered. Upon re-entering, the trial court said:

> All right, I just read Count 1. Now there's an additional finding on Count 1. The new form says, "We, the jury, being duly impaneled and sworn, having found the Defendant, Marcus E. Heald, guilty of Domestic Violence in Count 1, find that the State did prove beyond a reasonable doubt that the Defendant had previously been convicted of or pleaded guilty to two or more offenses of Domestic Violence," signed by all 12 jurors.

{¶81} The exact nature of the error in the original verdict form is not known. Appellant assumes that the error related to "the jury's failure to *make* the additional finding as to whether [Appellant] had two or more prior convictions for Domestic Violence." (Emphasis added.) This is simply not supported by the record. Appellant has not demonstrated that the first verdict form was the correct form to use and that the trial court actually replaced it with an incorrect form. Instead, the record suggests that the trial court itself had made an error in the verdict, noticed it as it began to read the verdict, and sent the jury back for further deliberations after correcting the error in the verdict form.

{¶82} In addition, the parties stipulated to Appellant's two prior convictions for Domestic Violence, making it unlikely that the jury found Appellant guilty of Domestic

Violence but found him not guilty on the additional finding that was based on stipulated prior convictions. Nothing in the record demonstrates that the outcome of the trial would have been different.

{¶83} Accordingly, Appellant's third and fourth assignments of error are without merit.

{¶84} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


EUGENE A. LUCCI, J.,

SCOTT LYNCH, J.,

concur.

Case No. 2025-L-010

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, Appellant's assignments of error are without merit.  It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

Costs to be taxed against Appellant.

_____
JUDGE JOHN J. EKLUND

_____
JUDGE EUGENE A. LUCCI,
concurs

_____
JUDGE SCOTT LYNCH,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2025-L-010