[Cite as *State v. Jackson*, 2026-Ohio-1914.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2025-L-121 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| MARK JACKSON, JR., | |
| Defendant-Appellant. | Trial Court No. 2025 CR 000059 |

## OPINION AND JUDGMENT ENTRY

Decided: May 26, 2026
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Jennifer A. McGee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender; *Rachelle M. Smith* and *Paul J. Lubonovic*, Assistant Public Defenders, 100 West Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

MATT LYNCH, P.J.

{¶1} Appellant, Mark Jackson, Jr., appeals the Lake County Court of Common Pleas judgment of conviction, which was rendered following a jury trial. Appellant contends his conviction for Strangulation should either be reversed on grounds of insufficient evidence or as against the manifest weight of the evidence. Upon consideration, we affirm.

{¶2} In March 2025, the Lake County Grand Jury indicted appellant on Count 1, Strangulation, a third-degree felony in violation of R.C. 2903.18(B)(3), and Count 2,

Domestic Violence, a fourth-degree felony in violation of R.C. 2919.25(A).  The indictment alleged that appellant committed these offenses on or about January 1, 2025, against an adult female victim who was a family or household member and with whom appellant was or had been in a dating relationship, and that appellant had been previously convicted of or pleaded guilty to felonious assault, domestic violence, and endangering children. Appellant waived his right to be present at arraignment, and the trial court entered pleas of "not guilty" on his behalf.

{¶3}    The matter proceeded to a jury trial on July 28, 2025, at which the following testimony was adduced from the alleged victim and four Painesville City police officers.

{¶4}    On January 1, 2025, appellant and the victim were engaged and lived together with their infant son at Hollydale Apartments in Painesville, Ohio.  Around 1:53 a.m., officers were dispatched to the apartment after receiving a 9-1-1 text and making a return call where the caller said "no" when asked if she was okay and then hung up the phone.

{¶5}    Officer Joseph Federico was the first witness to testify on behalf of the State.  Federico testified that he arrived on scene within three to five minutes of receiving the dispatch.  The victim opened the apartment door partway, appeared upset, said she was "going through things," and kept signaling with her eyes that someone was behind the door.  Federico asked her to step out, and the officers took her down the hallway to talk.  Federico testified that he spoke with the victim for about 5-10 minutes; her throat was "scratchy," she was speaking in a low tone of voice, and she became emotional while explaining what had happened.  The victim reported to the officers that she and appellant got into an argument about a message she saw on appellant's phone; she went into the

Case No. 2025-L-121

bedroom, and appellant followed her; appellant pushed her onto the bed and put his arms on her chest and laid on top of her; the victim was "choked" for about 15 minutes; she could not breathe and started to see "blurry spots"; their baby was on the bed beside them, so she could not roll over. Federico testified that this was the victim's statement to multiple officers throughout the time they were on scene and that the victim filled out a written statement which was consistent with what she had told them. Federico described the victim's voice as "scratchy" and said that, when asked, the victim said her voice was not normally like that. Federico testified that the victim explained this had happened to her "upper chest area." He observed no external physical injuries, but her "scratchy" voice and "swollen, puffy" eyes signified to him some kind of injury. Federico took pictures of the scene and of the front of the victim's neck to show the areas where the victim said the injury or the choking took place.

{¶6} Federico also testified that the Painesville police department does not wear body cameras but does use in-car dash cameras. The State introduced Federico's dash-cam recording, which included audio of the victim's interaction with himself and other officers. Federico described the victim's voice on the recording as "low" and "shaky." On the recording, which was played for the jury, the victim can be heard describing the altercation as Federico had described in his testimony.

{¶7} On cross-examination, Federico confirmed that he observed no cuts, bruises, or bloodshot eyes on the victim or on the photographs of the victim's neck. Federico acknowledged that a scratchy voice could have multiple causes, including being upset, and that he had limited prior contact with the victim. To his knowledge, the victim declined to be seen by EMS that night.

Case No. 2025-L-121

{¶8}     On redirect examination, Federico again stated that the victim said her voice sounded as it did, "scratchy," because she was "choked."  The victim told Federico that appellant had used his forearms to push down on the chest and neck areas depicted in the photographs he took.

{¶9}     The victim was the next witness to testify on behalf of the State.  The victim testified that she remained in a relationship with appellant after this incident occurred and admitted that she did not fully tell appellant what she had reported to the police about that night.  She texted 9-1-1 that night because she was "angry and afraid."  The victim described prior abuse by an ex-boyfriend, including choking, and stated that appellant knew choking was a trigger for her and that she has PTSD.  She testified that the January 1 dispute began over a message on appellant's phone; she had grabbed appellant's phone, and he was picking at her all day.  The victim went to the bedroom to be left alone, but he followed her in; their baby was on the bed with her.

{¶10}   The victim confirmed that appellant pushed her down on the bed and was laying on top of her with his full body weight, pushing down on her chest; she could not breathe and asked him to stop; it felt like he was doing this for 15-20 minutes; she started to see "blurs."  She fought and tussled but could not roll away because their baby was beside her on the bed.  She remembers writing in her statement that appellant had his arms crossed underneath her chest and neck, but she testified that appellant only put pressure on her chest.  When asked if she told Federico that her voice was raspy and hoarse because appellant was choking her, she said, "I don't recall."  The victim testified that appellant "did not choke me.  I was pissed off, wanted him out of my house, wanted to be left alone for a little bit . . . ."  She explained that her definition of "choked" is "just

Case No. 2025-L-121

someone laying on top of me or . . . keeping me from getting up," which she said is different from strangulation. The victim testified that she went to the bathroom after appellant released her and texted 9-1-1. The victim confirmed that when the officers arrived, she opened the door partway and signaled with her eyes that appellant was behind the door. She agreed that her voice was scratchy and low, her eyes were red, she had been crying, and she stepped into the hallway to talk quietly so appellant would not hear. She acknowledged that she said to appellant, "you choked me," in a recorded jail call. She also agreed that if appellant was convicted, it would jeopardize her family.

{¶11} On cross-examination, the victim described that on the day of the incident she was struggling with postpartum feelings and found a message on appellant's phone either to or from another female that made her mad. They started to argue; she took appellant's phone, he snatched it back, and she hit him on the shoulder. Appellant did not get physical with her at that point. The victim yelled at appellant to leave the apartment, but he did not. She went into their bedroom where he continued to bother her. She explained that appellant's arms were crossed up underneath her chest and neck, meaning that his arms were straight down on her chest and his knuckles were on her chin and neck. She denied any pressure to her neck or throat, airway closure, or circulation issues. The victim testified that appellant is an inch shorter than her and does not outweigh her. The victim said she was able to squirm, yell, spit, and fight back while he was on top of her. She was crying and started to panic because she was being held down and, as a result, she could not breathe. She described PTSD and panic responses to restraint and control, which she said can occur even when the danger is not real. She was seeing "blurs" because of her PTSD, getting tired of yelling and screaming and

Case No. 2025-L-121

tussling, but not because she could not breathe. She said the 15- to 20-minute reported duration was likely exaggerated; she never lost the ability to speak; she did not lose consciousness, bowel or bladder control, or memory; and she did not suffer pain, injury, bruises, or marks. She refused EMS service at the scene and never sought medical care. The victim admitted she pressed charges to get appellant out of the apartment for the night and was extremely mad when she wrote her statement. She agreed that her testimony of what occurred was different than in her written statement because she had calmed down and felt guilty for initiating the situation by hitting appellant in the shoulder and for spitting and yelling at him.

{¶12} On redirect examination, the victim agreed that she had repeatedly told appellant that she could not breathe and asked him to stop, describing his forearms on her chest and neck with his fists and knuckles at her chin. She acknowledged telling officers and writing in her statement that appellant had choked her and that her voice was scratchy and eyes were blurry from what he did, but she now attributed these symptoms to yelling and arguing. The victim said she wrote down in her statement what was needed to have appellant leave that night and used the word "choke," but that is not what happened.

{¶13} Three more responding officers testified on behalf of the State. Officer Cory Whitt testified to his experience with domestic violence and strangulation cases, and that there is not always a visible injury. When Whitt responded to the scene, the victim appeared different to him than he had seen her on prior occasions; her eyes were red, she seemed timid, and her voice was "scratchy as if she had a sore throat." The victim reported a physical altercation with appellant; she demonstrated to Whitt that appellant

Case No. 2025-L-121

had crossed his arms into an "X" and applied pressure to her throat area while she was on the bed. The victim told Whitt that she could not breathe and her voice was scratchy due to appellant putting his arms on her throat around her neck. Whitt testified that the victim's demeanor remained timid and upset during the hour he was on scene, her statements to other officers were consistent, and she wrote her statement without coaching.

{¶14} On cross-examination, Whitt confirmed that he observed no visible injuries on either party, including the victim's neck, and that appellant was cooperative and nonviolent while the officers were present. He agreed that there are many reasons someone's voice could be scratchy, including shouting or being upset.

{¶15} On redirect examination, Whitt testified that the victim told him her voice was scratchy because she was choked by appellant and agreed that he would not have expected to see any injuries based on how the victim described appellant pressing down on her.

{¶16} Officer Alexander Grove testified that when he arrived on scene, he observed the victim very distraught, red eyes as if she was crying, and soft-spoken; he stayed with her on the stair landing for about 45 minutes. Grove witnessed the victim write a statement, which they both signed. He testified that he did not tell the victim what to write, except to provide details, and that her written statement was consistent with what she had told him and the other officers.

{¶17} On cross-examination, Grove agreed that he was not first on the scene, had primary contact with the victim, observed no injuries on the victim, and did not go into the bedroom.

Case No. 2025-L-121

{¶18} On redirect examination, Grove testified that the victim told him she was held down and choked by appellant during an altercation over a phone; she demonstrated that appellant crossed his arms and pressed down on her upper chest area; she said she could not breathe during this period of time because all of his weight was on her, and she could not move while the baby was next to her in the bed.

{¶19} Officer Chad Balausky testified that he has prior domestic violence experience; he has responded to a few cases involving strangulation, suffocation, or choking, but does not have any specialized training in that area. He was one of the first responders and spent about an hour on scene. Balausky testified that the victim opened the door about halfway and was hesitant to talk with them; her eyes were red and watery as if she was crying; and she signaled that someone was behind the door. They asked the victim to step outside to speak with them; she was very soft spoken, almost as if she was whispering, and her voice was very raspy. Balausky testified that they talked with the victim for roughly 40 minutes, and she filled out a written statement. The victim explained that her voice was raspy because she was "choked" by appellant. She told Balausky that appellant pushed her down onto her back on the bed; appellant got on top of her, made a cross with his arms, and applied pressure to her throat area; she started seeing spots and could not breathe; she could not move or roll away because the baby was on the bed. Balausky testified he did not expect to see any injuries based on the victim's description, and he saw none. He also testified that the police department had no bodycams, and the dashcams had varying audio clarity; the recording that was played in court was consistent with the victim's account that night.

Case No. 2025-L-121

{¶20} On cross-examination, Balausky said that he was trained in basic first aid and CPR as a first responder; he did not call EMS to the scene because the victim declined and there were no obvious injuries. He testified to limited strangulation training, and that he would look for reddening on the neck area or possibly bloodshot eyes, none of which he observed on the victim.

{¶21} On redirect examination, Balausky agreed that threat responses can include elevated heart rate, raspy voice, and not being able to breathe if pressure is placed on the neck and throat and that this was not a "hands around the neck strangulation." He explained that pressure was applied to the victim's throat area to restrict her breathing; she was able to breathe normally after the fact, but not while it was happening. Balausky also confirmed that although the dashcam audio quality varied by distance or interference, he was able to hear the victim repeat the same statements the entire time the officers were there.

{¶22} At the close of the State's case, defense counsel made a Crim.R. 29 motion for judgment of acquittal on both counts. Defense counsel specifically argued that the State did not produce sufficient evidence of the harm element for either count and, regarding Strangulation, did not prove that appellant had applied pressure to the victim's throat or neck. The trial court denied the motion.

{¶23} Appellant presented no additional evidence and rested.

{¶24} The jury found appellant guilty on both counts as charged.

{¶25} The parties agreed that the two counts should merge for purposes of sentencing, and the State elected to proceed with sentencing on Count 1 (Strangulation). Thereafter, the trial court sentenced appellant to five years of community control.

{¶26} Appellant filed a timely notice of appeal, raising two assignments of error for our review:

[1.] There was insufficient evidence to support a conviction on Count 1, Strangulation.

[2.] The jury's verdict on Count 1 was against the manifest weight of the evidence.

{¶27} To convict appellant of Strangulation in violation of R.C. 2903.18(B)(3) the State was required to prove beyond a reasonable doubt that appellant "knowingly . . . [c]ause[d or create[d] a substantial risk of physical harm" to the victim "by means of strangulation or suffocation." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "'Strangulation or suffocation' means *any act* that impedes the normal breathing or circulation of the blood *by applying pressure* to the throat or neck, or by covering the nose and mouth." (Emphasis added.) R.C. 2903.18(A)(1).

{¶28} Appellant's appeal is based on the unique nature of the act of strangulation; to wit: the offender's application of pressure to a person's throat or neck. Notably, the statute does not specify an amount or type of "pressure" that must be applied, but it must be applied "to the throat or neck" by "any act" sufficient to impede "the normal breathing or circulation of the blood." Appellant contends that the State did not present sufficient evidence to demonstrate beyond a reasonable doubt that he applied pressure to the victim's throat or neck and that the jury lost its way when evaluating conflicting testimony on this issue. The State responds that appellant's Strangulation conviction was supported

Case No. 2025-L-121

by the manifest weight of the evidence, and, therefore, his conviction was also supported by sufficient evidence.

{¶29} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "'"[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *Id*., quoting *Black's Law Dictionary* (6th Ed. 1990). "In essence, sufficiency is a test of adequacy." *Id*. "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect in inducing belief.'" (Emphasis deleted.) *Id*. at 387, quoting *Black's*.

{¶30} "A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence." *State v. Heald*, 2025-Ohio-3031, ¶ 33 (11th Dist.), citing *State v. Arcaro*, 2013-Ohio-1842, ¶ 32 (11th Dist.); *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42-43 (1982) ("'[a] reversal based on the weight of the evidence . . . can occur only after the State both has presented sufficient evidence to support conviction and has persuaded the jury to convict'"); *see also State v. Gravely*, 2010-Ohio-3379, ¶ 46 (10th Dist.) ("Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of

Case No. 2025-L-121

sufficiency."). Therefore, we first examine whether appellant's conviction for Strangulation is against the manifest weight of the evidence.

{¶31} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs* at 42. "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id*., quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1983). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id*., quoting *Martin* at 175.

{¶32} This is not the exceptional case in which the evidence weighs heavily against conviction. Appellant contends that the jury lost its way in resolving evidentiary conflicts because although all officers received their information from the victim, only two of the officers testified that appellant had applied pressure to the victim's neck. The victim also testified that appellant had not applied pressure to her neck but instead applied pressure to her chest; she testified that she told the police appellant "choked" her because she was mad and wanted appellant removed from the apartment. However, "'[t]he trier of fact is free to believe or disbelieve all or any of the testimony' and 'is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.'" *State v. Csehi*, 2024-Ohio-

Case No. 2025-L-121

779, ¶ 20 (11th Dist.), quoting *State v. Jarrett*, 2023-Ohio-1627, ¶ 13 (11th Dist.). "'Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the factfinder's determination of the witnesses' credibility.'" *Id.*, quoting *Jarrett* at ¶ 13.

{¶33} Here, the jury was free to believe that the victim had been truthful when she made her initial statements to the police on the scene about the details of appellant's conduct; specifically, that appellant had crossed his forearms and pressed down on the victim's chest and neck with all his weight for what seemed like 15 minutes, affecting her ability to breathe. The victim's initial statements to police were also supported by testimony that the victim's voice was "scratchy" or "raspy" and that she repeatedly stated she could not breathe and her vision became blurry. The officers on the scene agreed that the victim's statement that evening was consistent with what they observed, and one officer took pictures of the areas of the victim's neck where she reported that appellant had applied pressure. The jury was also free to disbelieve the victim's trial testimony, which included a different explanation of the physical altercation and an assertion that she had not been completely truthful to police on the night in question because she was angry and wanted appellant to leave.

{¶34} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's conviction for Strangulation must be reversed.

Case No. 2025-L-121

{¶35} The jury's verdict on Count 1 was not against the manifest weight of the evidence. Consequently, there is no need to review appellant's first assignment of error, in which he asserts that the State did not present sufficient evidence to support his conviction on Count 1. Nevertheless, we affirmatively conclude that there was sufficient evidence for any rational juror to find beyond a reasonable doubt that appellant impeded the victim's normal breathing by using his forearms and fists to apply pressure to the victim's throat or neck.

{¶36} Appellant's assignments of error are without merit.

{¶37} The judgment of conviction entered by the Lake County Court of Common Pleas is affirmed.


EUGENE A. LUCCI, J.,

SCOTT LYNCH, J.,

concur.

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit. It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

PRESIDING JUDGE MATT LYNCH

JUDGE EUGENE A. LUCCI,
concurs

JUDGE SCOTT LYNCH,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.