[Cite as *State v. Cantrell*, 2024-Ohio-5406.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-65 |
| | : | |
| v. | : | Trial Court Case No. 2021CR0664 |
| | : | |
| TCHANAVIAN J. CANTRELL | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 15, 2024

. . . . . . . . . . .

CHIMA R. EKEH, Attorney for Appellant

MEGAN A. HAMMOND, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

**{¶ 1}** Defendant-Appellant Tchanavian J. Cantrell appeals from her conviction for endangering children in violation of R.C. 2919.22(B)(1). Specifically, she argues that the

trial court erred by denying her motion for a continuance three days before her trial. She also contends that her conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons outlined below, we affirm the judgment of the trial court.

## I. Background Facts and Procedural History

{¶ 2} On October 19, 2021, 12-year-old S.M. unexpectedly appeared at her former middle school in the Beavercreek City School District after having been recently withdrawn to be homeschooled. That morning, S.M. entered the office and asked secretary Julie Miller to print her class schedule. Miller, who was confused because S.M. had been withdrawn, asked S.M. if she remembered her old schedule and then asked S.M. to follow that until she could figure out what was going on. Miller then contacted the school district's central office and was told to have S.M.'s mother, Cantrell, pick her up.

{¶ 3} When Cantrell arrived at the school to pick up S.M., Miller called S.M.'s classroom to have her return to the office. After approximately 15 minutes had passed, S.M. had not returned to the office, so Miller called the classroom again. The teacher indicated that S.M. had been sent to the office immediately following Miller's first call. Miller and other staff members began to search the school for S.M., but they were unable to find her.

{¶ 4} The school reported to the sheriff's department that S.M. was missing from the school, and Greene County Sheriff's Office Major Shawn Prall responded to the scene to search for her. Major Prall decided to look for S.M. in a wooded area on the north side of the school, where it was suspected that S.M. was hiding. While he was walking in the

wooded area, S.M. ran toward him and was "shocked" to see him. According to Major Prall, S.M.'s eyes "were wide open" and "she was in a panic and out of breath and started to turn to run." Major Prall perceived S.M. as being "scared to death, running for her life" and recalled her saying that she could not go home because her stepfather ("Stepfather') and her mother beat her. To demonstrate that they had beaten her, S.M. attempted to raise her shirt to show Major Prall her lower backside; she said Stepfather and her mother had recently used a belt with metal on it to beat her before pouring alcohol into her wounds. An investigation of S.M.'s allegations ensued.

{¶ 5} Cantrell was later indicted and charged with one count of endangering children in violation of R.C. 2919.22(B)(1), a felony of the second degree; one count of endangering children in violation of R.C. 2919.22(B)(3), a felony of the second degree; one count of endangering children in violation of R.C. 2919.22(B)(3), a felony of the third degree; and one count of endangering children in violation of R.C. 2919.22(A), a felony of the third degree. She entered not guilty pleas.

{¶ 6} The matter was originally scheduled for a jury trial on July 25, 2022, but, on motion of the co-defendant (Stepfather), it was continued until February 6, 2023. In February 2023, the jury found Cantrell guilty of one count of endangering children in violation of R.C. 2919.22(B)(3), a felony of the third degree, but it was unable to reach verdicts on the other counts. The trial court declared a mistrial on those counts. The State elected to retry Cantrell on the remaining counts.

{¶ 7} The matter was then scheduled for a second jury trial on August 21, 2023. On April 4, 2023, the trial court had a telephone conference with Cantrell's defense

counsel, who indicated that he no longer represented her. On April 5, 2023, the trial court filed an entry advising Cantrell to notify the court within 14 days regarding her new representation. The court noted, "Defendant is advised that no continuances will be granted for the final pre-trial or the jury trial."

{¶ 8} On August 18, 2023, three days before trial, Cantrell's counsel filed a motion for a continuance because Cantrell was hospitalized at the time, but counsel did not specify the length of delay requested. The trial court denied Cantrell's continuance motion, and the matter proceeded to trial as scheduled on August 21. The jury then found Cantrell guilty of the remaining three counts. The trial court found that all four counts of endangering children were allied offenses that merged for sentencing; the State elected to proceed on Count One. On November 6, 2023, Cantrell was sentenced to a term of 8 to 12 years in prison. She appeals.

{¶ 9} The evidence presented as Cantrell's second trial was as follows.

{¶ 10} S.M. testified that, in October 2021, she lived at a residence in Beavercreek with four adults, including Cantrell (her mother), two other women named Tammara and Marquette, Stepfather, and approximately 13 other children who had been fathered by Stepfather with the women who resided in the home. S.M. and several of the other children living at the house had chore responsibilities, including doing the dishes, sweeping the floor, and supervising the younger children.

{¶ 11} S.M. stated that, approximately two days before she showed up at school on October 19, 2021, she was doing the dishes as part of her chores, and Tammara became dissatisfied with S.M.'s dishwashing methods. Tammara phoned Stepfather to

complain about S.M.'s unsatisfactory chore performance and then had S.M. stand in the corner for an unknown period of time until around midnight, when Cantrell and Stepfather returned to the house. As a continuation of her discipline, S.M. was told to grab a chair, move it to the middle of the room, and sit on it. She was then told to take off her shirt and pants and to put her hands on the pool table in anticipation of a "beating." S.M. testified that each of the four adults, including her mother, lashed her at least 20 times with a metal-studded belt. S.M. estimated that she was lashed 100 or 200 times over several "rounds." She described the force of the blows as a 7 or 8 on a scale of zero to 10, with zero being no force and 10 being the most force, and her pain as a 10 on a scale of zero to 10, with zero being no pain and 10 being the worst pain. S.M.'s backside was bleeding when they were done lashing her, and Stepfather directed one of the women to spray rubbing alcohol on her wounds, which caused the wounds to burn. Stepfather then ordered S.M. to do a wall squat for 30 minutes. S.M. eventually went to bed but was unable to sleep comfortably and without pain.

{¶ 12} The next day, S.M., who was still being homeschooled, was at home cleaning. The following day, S.M. left the house without permission and went to the school bus stop to return to her prior school even though she had been withdrawn. S.M. testified that she left home that morning because she did not feel safe. When she arrived at school via the school bus, she went to the office to ask about her schedule and was advised by Miller that she had been withdrawn from the school but that she could go to class based on her prior schedule.

{¶ 13} S.M. went to robotics class and then to study hall. During study hall, the

office called and asked her to return. S.M. knew that an adult from her house was likely there to pick her up, so she decided to run away because she was too terrified to return home. She ran into a small forest near the school, where she stumbled upon a police officer (Major Prall) who was looking for her.

{¶ 14} S.M. testified that the officer returned her to the school, where the nurse was able to view the injuries on her lower back from the earlier beating. She was later taken to the hospital, where photographs of her injuries were taken. Tammara's mother picked S.M. up from the hospital and took her to her house, where she remained until S.M.'s grandmother came to get her. S.M. never returned to the house where Cantrell and Stepfather lived. Eventually, S.M.'s biological father obtained custody, and S.M. now resides with him.

{¶ 15} Todd Suchy, a police officer for the City of Beavercreek, testified at trial that he was working as a school resource officer on October 19, 2021, when S.M. showed up at school. After S.M. was found and brought back into the school that morning, she told Officer Suchy that she had bruising and scabs from being hit at home, and Officer Suchy observed her injuries.

{¶ 16} Dr. Shernaz Wadia was on duty when S.M arrived at Dayton's Children's Hospital for evaluation of her injuries. Dr. Wadia testified that S.M. disclosed that she had been hit by a belt. Upon examining S.M., Dr. Wadia determined that S.M. had linear abrasions and bruising on her back and buttocks; she arranged for full photography of S.M.'s injuries and notified child advocacy. Dr. Wadia opined that S.M.'s injuries constituted severe abrasions to her lower back that were consistent with a belt injury.

S.M. did not require any additional treatment, and there was no concern of more severe internal injuries requiring blood tests, imaging, or pain medication.

{¶ 17} Dr. Kelly Liker, an expert in child abuse pediatrics and Chief of the Division of Child Advocacy at Dayton Children's Hospital, also opined that S.M.'s injuries were consistent with inflicted injury and, specifically, with S.M.'s report of being hit numerous times with a belt. Dr. Liker testified that she recommended counseling for S.M. because S.M. had expressed suicidal ideation and reported having dreams in which she heard the voices of her adult family members saying that they wished she had never been born. During a follow-up appointment with S.M., Dr. Liker noted that there were a couple of areas on S.M.'s back that could have persistent scarring.

{¶ 18} Marquette, one of the women who had lived in the house with S.M., testified as part of an agreement with the State in which she sought leniency. She admitted to using a metal-studded belt to punish S.M. after being instructed by Stepfather to "spank" her with 20 lashings over multiple rounds. She also testified that Stepfather and Tammara participated in using the belt on S.M. Marquette had not witnessed Cantrell beating S.M. with the belt. When S.M.'s beating concluded, Marquette applied rubbing alcohol to her bleeding wounds as commanded by Stepfather. Tammara, the other woman from the house, testified that she had not disciplined S.M. with a metal-studded belt or witnessed anyone else using a belt on S.M.

{¶ 19} Cantrell recounted a different version of events. She testified that she had, in fact, punished S.M. by whipping her approximately ten times with a belt after she learned that S.M. had been using a computer without permission. According to Cantrell,

S.M. pushed away from Cantrell during the lashings and ran outside; Cantrell followed and grabbed S.M. from behind, causing them both to lose their balance and fall backward onto concrete stairs. S.M. got up and ran, and Cantrell grabbed her by the back of her shirt, causing them both to fall again onto the gravel driveway. Cantrell then noticed that S.M. had scrapes on her back from the tussle, so she dabbed alcohol on S.M.'s wounds to clean them.

## II.    Assignments of Error

{¶ 20} Cantrell asserts three assignments of error on appeal.    The first assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S REQUEST FOR A CONTINUANCE OF THE JURY TRIAL.

{¶ 21} Cantrell contends that the trial court abused its discretion by denying her request for a continuance of the jury trial. Cantrell asserts that the length of delay requested was until she was out of the hospital and that no other continuance of the trial had been requested or granted. She also argues that the State, witnesses, co-defendants, and the court would not have suffered any inconvenience. She contends that her requested delay was for legitimate reasons, not dilatory, purposeful, or contrived reasons, and thus the court's denial of her motion was unreasonable, arbitrary, and unconscionable. We disagree.

{¶ 22} In evaluating a motion for a continuance, a court should consider several factors, including "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel

and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." *State v. Unger*, 67 Ohio St. 2d 65, 67-68 (1981), citing *United States v. Burton*, 584 F.2d 485 (1978); *Giacalone v. Lucas*, 445 F.2d 1238 (1971).

{¶ 23} A decision to grant or deny a motion for continuance is a matter left to the sound discretion of the trial court. *State v. Unger*, 67 Ohio St. 2d 65, 67 (1981). We will not reverse the denial of a continuance absent an abuse of discretion. *Id.* " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 24} In this case, we cannot say that Cantrell's request for continuance was dilatory, purposeful, or contrived, as she was apparently hospitalized at the time. However, Cantrell not specify the length of the delay requested, and other continuances had already been granted in this matter. In fact, the trial court had previously advised Cantrell in its April 5 entry that no additional continuances would be granted for the final pretrial conference or the jury trial. Moreover, any further delay would have inconvenienced litigants, witnesses, and opposing counsel, as several witnesses had been subpoenaed to testify.

{¶ 25} The incident in question occurred in October 2021, and Cantrell was indicted shortly thereafter. The original trial was continued from July 2022 to February 2023. The second trial was scheduled in August 2023, nearly two years after the events

that gave rise to the charges against Cantrell. Under these circumstances, we cannot say that the trial court abused its discretion in denying Cantrell's additional motion for a continuance. Thus, Cantrell's first assignment of error is overruled.

{¶ 26} We will consider Cantrell's second and third assignments of error together. Those assignments of error state:

APPELLANT'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 27} In her second assignment of error, Cantrell contends that her conviction was not supported by sufficient evidence demonstrating her "recklessness" and S.M.'s "serious physical harm." Based on Cantrell's version of events, she argues there was insufficient evidence that she was aware that S.M. would push away, run outside, and fall on the concrete steps and gravel driveway, injuring her backside. Alternatively, Cantrell contends that, even if the jury believed S.M.'s version of events, her culpability was limited to that of negligence, as she merely should have been aware that Stepfather would command the other women to beat S.M. and she only failed to exercise due care. She also argues that S.M. did not suffer any physical harm that carried a substantial risk of death. According to Cantrell, S.M.'s back wounds were superficial, and there was no evidence of broken bones or injury to organs, no need to treat the wounds, no signs of infection, no tests or medications ordered, and no long-term scarring. Additionally, she contends that S.M.'s description of her pain did not rise to the level of pain contemplated

by the statute to constitute "serious physical harm."

{¶ 28} In her third assignment of error, Cantrell argues that her conviction was against the manifest weight of the evidence. First, she contends that S.M.'s version of events—namely that she was struck a hundred or more times with a metal-studded belt but only suffered superficial injuries—was not believable. She argues that S.M.'s history of deceitfulness made her credibility questionable and that Major Prall's body cam video from his encounter with S.M. in the woods captured S.M.'s verbalization of her desire to be with her biological father. She also contends that the testimonial evidence of the witnesses at trial was inconsistent. For example, Cantrell testified that she had spanked S.M. with a belt and then S.M. was injured during a scuffle in the gravel driveway; Tammara testified that she was not involved with S.M.'s beating in any way and did not have personal knowledge regarding anyone else's role. Marquette, who agreed to testify as part of an agreement to earn leniency with the State, stated that she, Stepfather, and Tammara had been present during S.M.'s beating but Cantrell had not.

{¶ 29} A sufficiency of the evidence argument relates to a dispute concerning whether the State "presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins,* 78 Ohio St.3d 380 (1997). The test for sufficiency of the evidence was set forth in *State v. Jenks*, 61 Ohio St.3d 259 (1991):

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would

convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus. In other words, on review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Thompkins* at 390.

{¶ 30} A weight of the evidence argument, on the other hand, challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *Wilson* at ¶ 12, citing *State v. Hufnagel*, 1996 WL 501470, *3 (2d Dist. Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175 (1983), which states:

. . . [T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. . . .

"In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence presented." (Citation omitted.) *Wilson* at ¶ 14.

{¶ 31} "Although sufficiency and manifest weight are different legal concepts,

manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Flores-Lopez*, 2017-Ohio-690, ¶ 49 (2d Dist.), citing *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.); *accord State v. Robinson*, 2015-Ohio-1167, ¶ 17 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Flores-Lopez* at ¶ 49, citing *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

**{¶ 32}** The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact primarily to resolve. *Wilson* at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). In *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997), we explained:

> Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

**{¶ 33}** Additionally, the trier of fact is in the best position to consider inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Petty*, 2012-Ohio-2989, ¶ 38 (10th Dist.), citing *State v. Williams*, 2002-Ohio-4503, ¶ 58 (10th Dist.). "To that end, the fact finder is

free to believe all, part or none of the testimony of each witness appearing before it." *Id.*, citing *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). "Mere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment." *Id.*, citing *State v. Wilson*, 2007-Ohio-2202, ¶ 24. Moreover, "[i]t is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 2015-Ohio-820, ¶ 35 (12th Dist.). Thus, we will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *See Wilson* at ¶ 17, citing *State v. Bradley,* 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997).

{¶ 34} R.C. Chapter 2919 governs offenses against the family, and R.C. 2919.22 specifically relates to the endangering of children. R.C. 2919.22(A) states:

> No person, who is the parent, guardian, custodian, person having custody
> or control, or person in loco parentis of a child under eighteen years of age
> or a child with a mental or physical disability under twenty-one years of age,
> shall create a substantial risk to the health or safety of the child, by violating
> a duty of care, protection, or support. It is not a violation of a duty of care,
> protection, or support under this division when the parent, guardian,
> custodian, or person having custody or control of a child treats the physical
> or mental illness or disability of the child by spiritual means through prayer
> alone, in accordance with the tenets of a recognized religious body.

"Substantial risk" means "a strong possibility, as contrasted with a remote or significant

possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶ 35} R.C. 2919.22(B)(1) and (3) states:

No person shall do any of the following to a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age:

(1) Abuse the child;

(3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child;

"Abuse" includes acts of the child's parents causing "physical or mental injury that harms or threatens to harm the child's health or welfare." R.C. 2151.031(E). "Serious physical harm to persons" includes:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶ 36} "The degree of harm that rises to the level of 'serious' physical harm is not an exact science, particularly when the definition includes such terms as 'substantial,' 'temporary,' 'acute,' and 'prolonged.' " *State v. Bootes*, 2011-Ohio-874, ¶ 19 (2d Dist.), quoting *State v. Irwin,* 2007-Ohio-4996, ¶ 37 (7th Dist.). "Under certain circumstances, a bruise can constitute serious physical harm because a bruise may satisfy the statutory requirement for temporary serious disfigurement." *Id.*, citing *State v. Worrell,* 2005-Ohio-1521, ¶ 47-51 (10th Dist.), *reversed on other grounds by In re Criminal Sentencing Statutes Cases*, 2006-Ohio-2109.

{¶ 37} A parent may use physical punishment as a method of discipline so long as the discipline "is proper and reasonable under the circumstances." *State v. Thompson*, 2006-Ohio-582, ¶ 29 (2d Dist.), citing *State v. Adaranijo,* 2003-Ohio-3822 (1st Dist.). "Proper" and "reasonable" have been defined as "suitable or appropriate" and "not extreme or excessive." *Id.*, quoting *State v. Hicks*, 88 Ohio App .3d 515 (10th Dist. 1993). "Of course, the nature of any physical injury inflicted or attempted to be inflicted may be evidence demonstrating that the actor's conduct was not proper and reasonable parental discipline." *Id.*, citing *State v. Hause*, 1999 WL 959184 (2d Dist. Aug. 6, 1999).

{¶ 38} "Whether corporal punishment or physical discipline is excessive is determined in light of the totality of the circumstances." *In re J.L.*, 2008-Ohio-1488, ¶ 35

(3d Dist.), citing *State v. Hart*, 110 Ohio App.3d 250, 255-256 (1996). "In analyzing the totality of the circumstances, a court looks at several factors, including (1) the child's age, (2) the behavior being disciplined, (3) the child's response to correction, (4) the location and severity of the punishment, and (5) the parent's state of mind while administering the punishment." *Id.*; *State v. Jones*, 140 Ohio App.3d 422, 430 (8th Dist. 2000).

{¶ 39} The State must prove recklessness on the part of a defendant as defined in R.C. 2901.22(C) in order for the defendant to be found guilty of violating R.C. 2919.22. *See State v. Adams*, 62 Ohio St.2d 151, 153 (1980). "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶ 40} In the case before us, Cantrell does not dispute that she administered physical discipline to S.M,; rather, she asserts that she did not do so recklessly and that S.M. did not suffer serious physical harm. The witnesses presented differing accounts of what happened, and this is a case in which the members of the jury were forced to choose between conflicting sets of testimony. "We will not disturb the choice made by the trier of the facts between witnesses and conflicting testimony unless it is so incredible that it defies belief . . ." *State v. Morgan*, 2002-Ohio-3567, ¶ 8 (2d Dist.).

{¶ 41} At trial, S.M. testified that Tammara had been dissatisfied with S.M.'s method of doing the dishes, so she phoned Stepfather to complain about S.M.'s

unsatisfactory performance. S.M. was ordered to stand in the corner for an unknown period of time until Cantrell and Stepfather returned to the house. S.M. was then told to grab a chair, move it to the middle of the room, sit on it, take off her shirt and pants, and put her hands on the pool table in anticipation of a "beating." S.M. testified that each of the four adults living at her house, including her mother, took turns lashing her with a metal-studded belt. She estimated that she was lashed 100 or 200 times over several "rounds." She described the force of the blows as a 7 or 8 out of 10, and her pain as a 10 out of 10. She stated that her back was bleeding, and Stepfather directed one of the women to spray rubbing alcohol on her wounds, causing them to burn. Stepfather then ordered her to do a wall squat for 30 minutes. She was unable to sleep comfortably and without pain that night.

{¶ 42} Others testified that they had observed the wounds on S.M.'s back. Dr. Wadia determined that S.M. had linear abrasions and bruising on her back and buttocks. Dr. Liker recommended counseling for S.M. because of her suicidal ideation and nightmares. Both physicians testified that the appearance of S.M.'s wounds was consistent with being beaten with a belt, and Dr. Liker noted that there were areas on S.M.'s back that could have lasting scarring.

{¶ 43} While Cantrell testified that she had spanked S.M. using a belt with no more than 10 lashings and that the marks on S.M.'s backside had occurred when she fell on the concrete steps and gravel driveway, the jury found other witnesses' testimony to be more credible. The jury could have reasonably concluded that Cantrell acted recklessly when she struck S.M. multiple times with a metal-studded belt and that her actions were

executed with heedless indifference to the consequences of causing S.M. to suffer acute pain and a prolonged injury requiring medical attention. The jury could have reasonably concluded that, by beating S.M. with the metal-studded belt, Cantrell had disregarded a substantial and unjustifiable risk, and that Cantrell's conduct, apparently provoked by S.M.'s failure to adequately wash the dishes, was unreasonable under the circumstances. The blows to S.M.'s backside with the metal-studded belt created a risk of serious physical harm and substantial pain, having a residual effect of requiring medical care.

{¶ 44} We give due deference to the jury's determination of the credibility of the evidence and the weight to be given to the testimony of each witness, and we will not substitute our judgment for that of the jury on the issue of witness credibility. The jury had the opportunity to view the witnesses' testimony and judge their credibility. The jury could have reasonably concluded that S.M.'s testimony was credible.

{¶ 45} The record does not support a conclusion that the jury lost its way at arriving at its verdict and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. After examining the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we find that Cantrell's conviction for endangering children was not against the manifest weight of the evidence.

{¶ 46} Finally, our determination that Cantrell's conviction was supported by the weight of the evidence is dispositive of the issue of sufficiency. However, we also conclude that the evidence presented, when viewed in a light most favorable to the State, was sufficient to demonstrate that Cantrell had acted recklessly in administering physical

discipline to S.M. by lashing her multiple times with a metal-studded belt and that such physical discipline was excessive considering the totality of the circumstances. This was enough to support the jury's determination that the elements of endangering children had been proven beyond a reasonable doubt.

{¶ 47} Cantrell's second and third assignments of error are overruled.

### III.      Conclusion

{¶ 48} The judgment of the trial court is affirmed.

. . . . . . . . . . . .


WELBAUM, J. and LEWIS, J., concur.