[Cite as *State v. Cantrell*, 2026-Ohio-1675.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2024-CA-68 |
| Appellee | : | |
| | : | Trial Court Case No. 2021 CR 0663 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| JOHN WESLEY CANTRELL, III | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on May 8, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

TUCKER, J., and HUFFMAN, J., concur.

COLIN P. COCHRAN, Attorney for Appellant
MEGAN A. HAMMOND, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Defendant-appellant John Wesley Cantrell III appeals from his conviction in the Greene County Common Pleas Court after a jury found him guilty of endangering children. Cantrell argues that his conviction is against the manifest weight of evidence and based on legally insufficient evidence. Cantrell also contends that the trial court abused its discretion in denying his motion to continue the trial. For the reasons discussed below, the judgment of the trial court is affirmed.

## I. Facts and Course of Proceedings

{¶ 2} On December 17, 2021, Cantrell was indicted for one count of endangering children in violation of R.C. 2919.22(B)(1), a felony of the second degree;[1] one count of endangering children in violation of R.C. 2919.22(B)(3), a felony of the second degree;[2] one count of endangering children in violation of R.C. 2919.22(B)(3), a felony of the third degree;[3] and one count of endangering children in violation of R.C. 2919.22(A), a felony of the third

---

1. For recklessly abusing a child, which caused serious physical harm to the child.

2. For recklessly administering corporal punishment or other physical disciplinary measures, or physically restraining the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint was excessive under the circumstances and caused serious physical harm to the child.

3. For recklessly administering corporal punishment or other physical disciplinary measures, or physically restraining the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint was excessive under the circumstances and created a substantial risk of serious physical harm to the child.

degree.[4] Each charge indicated that the offense occurred between October 7, 2021, to October 19, 2021. At arraignment, Cantrell entered pleas of not guilty.

{¶ 3} The matter was originally scheduled for a jury trial on July 25, 2022; however, on Cantrell's motion to continue, it was continued to February 6, 2023. After trial in February, the jury returned a guilty verdict on count three of the indictment only. After the jury was unable to come to unanimous verdicts on counts one, two, and four, the trial court declared a mistrial on those three counts, and the State elected to retry Cantrell. The matter was then scheduled for a second jury trial on August 21, 2023.

{¶ 4} On April 5, 2023, Cantrell's counsel withdrew from the case. In a judgment entry also filed on April 5, 2023, the trial court advised Cantrell to notify the court within 14 days regarding his new representation. In the entry, the court indicated that "Defendant is advised that no continuances will be granted for the final pre-trial or the jury trial."

{¶ 5} On April 21, 2023, counsel for Cantrell entered an appearance. On June 22, 2023, counsel was substituted. On August 2, 2023, a third attorney retained by Cantrell entered an appearance and filed a motion to continue the trial. That motion was denied by the trial court on August 10, 2023. On August 16, 2023, counsel filed a second motion to continue the trial stating the necessity of needing additional time to prepare for trial; however, the trial court again denied the request. The trial court also denied a motion to continue the trial filed by Cantrell's co-defendant, Tchanavian J. Cantrell. On August 21, 2023, Cantrell's second trial began as scheduled. The following testimony was presented by the State.

{¶ 6} In the month of October 2021, and during the time of the charged offenses, S.M. was 12 years old and living in Cantrell's home, which he shared with his wife (Marquette

_____

4. For being a person in loco parentis of a child under eighteen years of age and recklessly creating a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

3

Cantrell) and two other adult women, Tchanavian J. Cantrell ("Tchanavian") and Tammara Moreland, a.k.a. Tammara Cantrell ("Tammara"). Cantrell fathered approximately 14 or 15 children with the adult women in the home. However, S.M. was the sole exception. S.M.'s mother was Tchanavian, but S.M.'s biological father did not live in the home.

{¶ 7} At some point prior to October 2021, Tchanavian withdrew S.M. from school. According to S.M.'s testimony at trial, she was the only child in the house charged with the responsibility of doing dishes or other chores. S.M. said that the normal consequence for not doing chores correctly was either to get a "whipping or beating" or to "be put squatting on the wall." On a day between October 7, 2021, and October 19, 2021, S.M. did not do the dishes correctly. Tammara noticed and made a phone call to Cantrell. Tammara told S.M. to stand in the corner.

{¶ 8} Cantrell and Tchanavian returned home around midnight and S.M. was told to sit in a chair for a talk by the adults. S.M. was instructed by one of the adults to remove her shirt and pants, go to the pool table in the living room, and bend over. S.M. complied. She was then struck by each adult at least 20 times each with a metal studded belt across her lower backside and buttocks. S.M. recalled hearing Cantrell tell Tchanavian to strike S.M., which Tchanavian did 20 times. S.M. also recalled Cantrell striking her 40 times. After each adult struck S.M., Tchanavian left the room and S.M. received what she called a "second round." She described being struck with the same metal studded belt by Cantrell 40 times, Tammara 20 times, and Marquette 20 times. A "third round" and "fourth round" followed, identical to the first two rounds.

{¶ 9} Sometime between the third and fourth round, S.M.'s backside was sprayed with a bottle of rubbing alcohol. S.M. recalled Cantrell telling Marquette to get the bottle. S.M. also testified that sometime around the "third round" or "fifth round," one of the adults

4

called S.M.'s siblings down to the room. S.M. then received additional whippings with the metal studded belt until Cantrell asked S.M.'s siblings if they should continue the whippings or if they should stop. One of S.M.'s siblings gave a reason why the whipping should stop, and the whipping ceased. S.M.'s siblings left the room, and Cantrell ordered S.M. to squat on the wall for 30 minutes. Thereafter, S.M. went to bed but was unable to sleep comfortably without pain.

{¶ 10} S.M. described the pain level she felt by the belt strikes as being a 10 on a scale of 0 to 10. S.M. also testified that when the alcohol spray hit her lower back it "stung greatly." The next day, S.M. did chores while her siblings went to school.

{¶ 11} S.M. described not feeling safe at home the following day. S.M. testified that she left the house and rode her old school bus to her former school. Even though S.M. had been withdrawn from the school, according to S.M., the office told her to follow her old schedule. She attended a couple of classes until being called to the office. S.M. learned that one of the adults from the home had arrived at the school to retrieve her, so she ran away to hide in nearby woods. While S.M. was running in the woods, she ran into a police officer.

{¶ 12} S.M. testified that the officer returned her to the school, where the nurse was able to view the injuries on her lower back from the earlier beating. She was later taken to the hospital, where photographs of her injuries were taken. Tammara's mother picked S.M. up from the hospital and took her to her house, where she remained until S.M.'s grandmother came to get her. S.M. never returned to the house where Cantrell and her mother lived. Eventually, S.M.'s biological father obtained custody of S.M., and she has remained living with him since that time.

{¶ 13} Major Michael Shawn Prall of the Greene County Sheriff's Office responded to a missing child report on a dispatch to S.M.'s former school to assist in locating her. When

Major Prall was on foot in the woods, he observed S.M. running and being out of breath. Major Prall described S.M. as appearing in a panic, with eyes wide open, and running for her life. When S.M. saw him, she exclaimed that she could not go home because Cantrell and her mother beat her. After Major Prall calmed S.M. down, she disclosed that she was struck by both parents with a belt that had metal on it, and afterwards, they poured alcohol on her wounds.

{¶ 14} Officer Todd Suchy was a police officer with the City of Beavercreek employed as a school resource officer in October 2021. He testified that he met with S.M. once she was brought back from the woods to the school. Officer Suchy observed S.M.'s injuries on her back and noticed scabbing. On cross-examination, Officer Suchy described S.M.'s back injuries as scabbing that appeared as if S.M.'s skin was dragged across blacktop, similar to road rash. Officer Suchy also stated on cross-examination that S.M. disclosed the whipping occurred two weeks prior.

{¶ 15} Dr. Shernaz Wadia was on duty on October 21, 2021, when S.M arrived at Dayton's Children's Hospital for evaluation of her injuries. Dr. Wadia testified that S.M. disclosed that she had been hit by a belt. Upon examining S.M., Dr. Wadia determined that S.M. had linear abrasions and bruising on her back and buttocks. The doctor arranged for full photography of S.M.'s injuries and notified child advocacy. Dr. Wadia testified that S.M.'s injuries involved severe abrasions to her lower back that were consistent with a belt injury. Dr. Wadia opined that the bruising and abrasions on S.M.'s back indicated that S.M. was hit with forces hard enough to leave bruising. S.M. did not require any additional treatment, and there was no concern of more severe internal injuries requiring blood tests, imaging, or pain medication. On cross-examination, Dr. Wadia admitted that wounds to skin tissue are superficial wounds and that in S.M.'s case, there were no broken bones or injuries to her

6

internal organs. Dr. Wadia also admitted that she did not observe evidence of large patches of scabbing or see indicators of long-term scarring.

{¶ 16} Dr. Kelly Liker testified as an expert in child-abuse pediatrics. Dr. Liker was the Chief of the Division of Child Advocacy at Dayton Children's Hospital in October 2021. Dr. Liker testified that in her medical opinion, S.M.'s injuries were consistent with being struck by a belt. Dr. Liker also opined that the injuries she observed on S.M. were consistent with child abuse. Dr. Liker described S.M.'s injuries as patterned, and they were not disorganized as one would see in an injury related to a fall onto concrete or a step. Dr. Liker explained that skin injuries occurring from falls on concrete steps or from scrapes by sidewalks or roadways present in a disorganized, nonpatterned manner. Dr. Liker recommended counseling for S.M. because S.M. expressed suicidal ideation and reported having bad dreams about her family. During a follow-up appointment with S.M., Dr. Liker noted that there were a couple of areas on S.M.'s back that could develop persistent scarring.

{¶ 17} On cross-examination, Dr. Liker admitted that S.M.'s wounds healed relatively well and that she did not personally see S.M. on October 19, 2021. Dr. Liker also admitted that she relied on S.M.'s explanation of her injuries in evaluating the photographs of those injuries. Dr. Liker agreed that S.M. appeared to have vertical lines on her back, in addition to 12 lines that were horizontal across her back. When asked about road rash, Dr. Liker agreed that road rash injuries to skin were classified as mechanical tissue damage, the same classification as S.M.'s tissue injuries from the belt.

{¶ 18} Cantrell's wife, Marquette, testified as part of a plea agreement with the State in which she had sought leniency. Marquette admitted to using a metal-studded belt to punish S.M. after being instructed by Cantrell to "spank" S.M. with 20 lashings over multiple

7

rounds. Marquette also testified that Cantrell and Tammara participated in using the belt on S.M., with each person striking S.M. at least 20 times per round at Cantrell's direction. Marquette recalled S.M. crying and wincing during the lashings.

{¶ 19} While Marquette would not admit to hitting S.M. hard, Marquette said that when Cantrell ordered alcohol to be sprayed on S.M.'s back, her back was bruised and bleeding from open wounds. Marquette testified that she believed the discipline was excessive and abusive. Marquette also testified that once she learned police were involved, everyone in the home spoke to the children and told them not to disclose S.M.'s spanking. Marquette also recalled that upon learning of an investigation, everyone in the home left and stayed at different hotels.

{¶ 20} On cross-examination, Marquette admitted to her plea agreement. She disclosed that she had filed a divorce action against Cantrell and was in a pending custody dispute. Marquette confirmed that S.M. did a wall squat after the whipping with the belt concluded. On redirect, Marquette testified that she struck S.M. with the belt because Cantrell told her to and that she was afraid of Cantrell. Marquette also stated that Cantrell instructed her to get rid of the belt and, if questioned by police, to say she was not home and did not know anything.

{¶ 21} Jace Elliott, an assistant general manager of the Holiday Inn Express, testified that records of the Holiday Inn show Marquette checked into the hotel on October 21, 2021, for two separate rooms, units 412 and 414.

{¶ 22} City of Beavercreek Police Department Detective Robert Lee testified that he participated in the execution of a search warrant on Cantrell's home on October 21, 2021. Detective Lee recalled that around 8:00 p.m. when the search took place, Cantrell was home with two women. Detective Lee located the spray bottle that contained alcohol from a kitchen

8

cabinet and recalled photographs of belts being taken. On cross-examination, Detective Lee could not recall observing any blood on any belts and could not state with certainty whether any belts were seized from the home. Detective Lee admitted that while he was in the home, he did not observe blood stains on the walls, carpet, or ceiling.

{¶ 23} Julie Miller, a school secretary, testified that she was working on the morning of October 19, 2021, when S.M. unexpectedly arrived at school. Miller confirmed that she told S.M. to follow her previous schedule even though the school had records showing S.M. had been withdrawn. Miller testified about the events of the day and the efforts made to locate S.M. after she went missing from the school. Miller recalled a telephone call with Tchanavian where Tchanavian told her to stop looking for S.M., stating that S.M. would turn up on her own.

{¶ 24} Once the State rested its case, Tchanavian testified as part of her own defense. Tchanavian denied S.M.'s version of events, in which all four adults in the home, including Cantrell, whipped S.M. with a metal studded belt 20 times each in rounds. Instead, Tchanavian said that she alone punished S.M. by using a regular belt on her approximately ten times after she learned that S.M. had been using a computer without permission. According to Tchanavian, S.M. pushed away from her during the spanking and ran outside. Tchanavian ran after S.M. and grabbed S.M. from behind, causing them both to lose their balance and fall backward on concrete stairs. S.M. got up to run again, but Tchanavian grabbed her by the back of her shirt, causing them both to fall again on the gravel driveway. Tchanavian testified that she fell on top of S.M., and S.M. fell on her back. Once Tchanavian got S.M. calmed down, she helped S.M. up, and S.M. indicated her back hurt. Tchanavian then noticed S.M. had scrapes on her back from the fall and tussle, so Tchanavian dabbed alcohol on S.M.'s wounds to clean them.

9

{¶ 25} Cantrell called Tammara as his sole witness. Tammara was also charged with endangering children. However, she was not joined as a co-defendant with Cantrell and Tchanavian. Tammara testified about the household generally and described Cantrell as a good father, who did not rule the house, the women, or the children with an "iron fist." Tammara denied that S.M. was the only child responsible for all chores or dishes and denied punishment being given to any of the children if any chore was not done correctly. Tammara testified that Cantrell never spanked or used a belt on any of her children and that each woman in the house was responsible for the discipline of their own children.

{¶ 26} Regarding the events of October 17, 2021, Tammara denied telling S.M. to stand in the corner after finding dirty dishes. Tammara also denied using a belt on S.M., or seeing anyone else in the home, including Cantrell, using a belt on S.M. Tammara also denied knowledge of a metal-studded belt in the home and stated that she had never heard of wall squatting or chair sitting as a form of punishment of any of the children in the home. On cross-examination, Tammara admitted that she had seen the photographs of S.M.'s injuries. But she said that she was not home and did not know how S.M. received the injuries.

{¶ 27} After deliberating, the jury found Cantrell guilty of endangering children on all counts as charged. At his sentencing on October 25, 2023, the trial court found that the endangering children counts were allied offenses that merged for sentencing. The State elected to proceed on Count One. Cantrell was sentenced to a term of 8 to 12 years in prison on count one only, with counts two, three and four having been merged. This appeal followed.

**II. Assignments of Error**

Cantrell sets out three separate assignments of error:

APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

APPELLANT'S CONVICTIONS ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

THE TRIAL COURT ERRED IN REFUSING GRANT APPELLANT'S REQUESTED CONTINUANCE.

For ease of discussion, we address Cantrell's first and second assignments of error together.

### III. Sufficiency and Manifest Weight of the Evidence

### Standard of Review

{¶ 28} "'When a defendant challenges the sufficiency of the evidence, [he] is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law.'" *State v. Humphreys*, 2026-Ohio-373, ¶ 54 (2d Dist.), quoting *State v. Matthews*, 2018-Ohio-2424, ¶ 7 (2d Dist.). "'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Matthews* at ¶ 7, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997), citing *Jenks* at 273.

**{¶ 29}** By contrast, "'[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive.'" *Humphreys* at ¶ 55, quoting *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagle*, 1996 WL 501470 (2d Dist. Sept. 6, 1996). "When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Anderson*, 2024-Ohio-2003, ¶ 14 (2d Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Only in exceptional circumstances will a judgment of conviction be reversed as being against the manifest weight of the evidence. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

**Count One of the Indictment – Endangering Children – R.C. 2919.22(B)(1)**

**{¶ 30}** Cantrell was found guilty and was sentenced on count one of the indictment, endangering children in violation of R.C. 2919.22(B)(1). This division of the statute prohibits a person from abusing a child under eighteen years of age. *Id.* When the abuse results in serious physical harm to the child involved, a violation of R.C. 2919.22(B)(1) elevates to a felony of the second degree. R.C. 2919.22(E)(2)(d). Recklessness is the required mental state for endangering children. *State v. McGee*, 79 Ohio St.3d 193 (1997); *State v. Adams*, 62 Ohio St.2d 151 (1980); *State v. O'Brien*, 30 Ohio St.3d 122 (1987); R.C. 2901.21(B).

**{¶ 31}** "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is

12

reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." R.C. 2901.22(C). "'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶ 32} "'Abuse' means any act that causes physical or mental injury that harms or threatens to harm the child's health or welfare." *Ohio Jury Instructions*, CR § 519.22 (Rev. May 4, 2013), citing R.C. 2151.031(D). R.C. 2901.01(A)(5) defines "serious physical harm" as any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 33} Cantrell's argument for the sufficiency of evidence assignment of error centers on serious physical harm. "'[T]he exact level of harm required to establish serious physical harm "is not an exact science."'" *Humphreys*, 2026-Ohio-373, at ¶ 78 (2d Dist.), quoting *State v. Heald*, 2025-Ohio-3031, ¶ 41 (11th Dist.), quoting *State v. Irwin*, 2007-Ohio-4996,

13

¶ 37 (7th Dist.). "'In certain circumstances, bruising can constitute serious physical harm.'" *Id.* at ¶ 79, quoting *Heald* at ¶ 43. "'The degree of harm that constitutes "serious physical harm" is normally a matter of weight rather than sufficiency of the evidence.'" *Id.* at ¶ 85, quoting *Heald* at ¶ 41, citing *State v. Sanabria*, 2019-Ohio-2869, ¶ 15 (11th Dist.).

**{¶ 34}** Of relevance in this case is R.C. 2901.01(A)(5)(e), which is "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." The committee comments to R.C. 2901.01(A)(5)(e) explain that this subdivision of "serious physical harm" means "pain which is unbearable or nearly so, though short-lived, and pain which is long-lasting or difficult to relieve, though not as keen." At trial, S.M. testified that each of the four adults living at her house, including Cantrell, took turns lashing her with a metal-studded belt. She estimated that she was whipped 100 or 200 times over several "rounds." She described the force of the blows as a 7 or 8 out of 10, and her pain as a 10 out of 10. She stated that her back bled from the lashings, and Cantrell directed one of the women to spray rubbing alcohol on her wounds, causing them to burn. Cantrell then ordered her to do a wall squat for 30 minutes. S.M. was unable to sleep comfortably and without pain that night. The open wounds turned into scabs, which were observed days later. At least 12 horizontal marks were visibly noticeable to medical providers and law enforcement officers days later. S.M.'s testimony was corroborated by Marquette who described S.M. wincing when she was lashed by Cantrell and crying the entire time. In our view, the repeated whipping of S.M. with the metal-studded belt and subsequent spray of alcohol on the wounds constituted "acute pain" and resulted in "substantial suffering." There is sufficient evidence in this record to conclude the existence of serious physical harm. Additionally, the jury specifically found serious physical

14

harm, and we cannot conclude the jury was unreasonable in finding that this element was established.

{¶ 35} In challenging the evidence supporting the finding of serious physical harm in this case, Cantrell relies on *State v. Ivey*, 98 Ohio App.3d 249 (8th Dist.1994); *State v. Snyder*, 2011-Ohio-1062 (8th Dist.;) and *State v. Enovitch*, 1998 WL 518163 (8th Dist. Aug. 20, 1998). In *Ivey*, a father whipped his ten-year-old son with a belt for not telling him about receiving detention at school. In *Snyder*, a father disciplined his toddler for a potty-training incident by hitting her multiple times on the rear end. In *Enovitch*, a felonious assault case, a victim was punched and suffered a cut over the eyebrow requiring eleven stitches. The Eighth District Court of Appeals reversed the conviction in each of these cases because there was insufficient evidence of "serious physical harm." However, these cases are distinguishable because none of them relied on R.C. 2901.01(A)(5)(e). Additionally, while these three cases lacked sufficient proof of serious physical harm on their particular facts, the record before us in Cantrell's case does not.

{¶ 36} The photographs of S.M.'s injuries show substantial bruising, coupled with healing wounds that appear to have been once open wounds, horizontal lines, red vertical lines, and multiple scabs. The State's expert witness Dr. Liker described the injuries in the photographs as "patterned" and consistent with being struck by a belt. The jury viewed the photographs and could have reasonably concluded that the injuries depicted were consistent with some temporary, serious disfigurement as defined in R.C. 2901.05(A)(4). The jury's conclusion of serious physical harm in this case is consistent with other similar cases. *See State v. Hill*, 2025-Ohio-5500 (7th Dist.) (serious physical found from different patterns of bruising and scabs on the victim's right arm; looped bruising with a scab on the victim's underarm; bruising with loops on the victim's back; patterned bruising with a

15

scab/laceration on the victim's shoulder or underarm; and bruising with linear injury to the left arm, caused by someone hitting the victim with an object); *State v. Krull*, 2003-Ohio-4611 (12th Dist.) (serious physical harm found from bruising on the victim's buttocks and legs, some of which involved raised linear marks, and a bloody cut); *State v. Burdine-Justice*, 125 Ohio App.3d 707 (12th Dist. 1998) (serious physical harm found from moderate bruises, starting at the lower back and going down onto the victim's buttocks, that were purple and red in color and appeared to have not been there very long).

**{¶ 37}** Aside from the issue of serious physical harm, we further conclude that the jury could have reasonably found from the evidence that Cantrell is guilty of endangering children as charged under R.C. 2919.22(B)(1). Dr. Liker's expert opinion was that S.M.'s injuries were consistent with child abuse. S.M.'s description of the whipping and punishment was corroborated by Marquette's testimony, which included her account that she felt the discipline was abusive. Further, though some witnesses testified that Cantrell was not involved, S.M. and Marquette both testified that Cantrell not only gave orders to others to whip S.M. 20 times but also had personally participated in S.M.'s whipping during each of the rounds. This evidence supports the jury's verdict that Cantrell recklessly abused S.M. causing serious physical harm.

**{¶ 38}** Cantrell also argues that his conviction is not supported by the manifest weight of the evidence because S.M.'s testimony was unbelievable and some witnesses had different stories or were inconsistent with one another. However, as we explained in the manifest weight of the evidence review in the appeal of Cantrell's co-defendant:

> The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact primarily to resolve. *Wilson*, [2009-Ohio-525] at ¶ 15 [(2d Dist.)], citing *State v. DeHass*, 10 Ohio St.2d 230 (1967).

16

In *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997), we explained:

> Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

Additionally, the trier of fact is in the best position to consider inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Petty*, 2012-Ohio-2989, ¶ 38 (10th Dist.), citing *State v. Williams*, 2002-Ohio-4503, ¶ 58 (10th Dist.). "To that end, the fact finder is free to believe all, part or none of the testimony of each witness appearing before it." *Id*., citing *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). "Mere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment." *Id*., citing *State v. Wilson*, 2007-Ohio-2202, ¶ 24. Moreover, "[i]t is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 2015-Ohio-820, ¶ 35 (12th Dist.). Thus, we will not substitute our judgment for that of the trier of fact on the issue of

17

witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. See *Wilson* at ¶ 17, citing *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997).

*State v. Cantrell*, 2024-Ohio-5406, ¶ 32-33 (2d Dist.).

{¶ 39} While Cantrell contends that S.M.'s testimony is unbelievable and both S.M. and Marquette had motives to lie, the jury heard all the evidence and determined which witnesses were believable and what portions of inconsistencies were trustworthy. The jury could have reasonably concluded that the testimony of S.M., Marquette, Dr. Wadia, and Dr. Liker was credible. The testimony was further corroborated by S.M.'s conduct in going to a school at which she was not enrolled and then running away from the school upon learning that an adult was looking for her to take her back home. Other witnesses, such as Major Prall, observed S.M. and described her as appearing in a panic, with eyes wide open, and running for her life. When S.M. saw Major Prall, she said that she could not go home because Cantrell and her mother beat her with a belt that had metal on it and then poured alcohol on the wounds.

{¶ 40} We give due deference to the jury's determination of the credibility of the evidence and the weight to be given to the testimony of each witness, and we will not substitute our judgment for that of the jury on the issue of witness credibility. The jury had the opportunity to view the witnesses' testimony and judge their credibility. The record does not support a conclusion that the jury lost its way at arriving at its verdict and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. After examining the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we find that Cantrell's conviction for endangering children is not against the manifest weight of the evidence.

18

**Endangering Children – Counts Two, Three, and Four of the Indictment**

{¶ 41} Cantrell also challenges the sufficiency and manifest weight of the evidence relating to his other three endangering children counts under R.C. 2919.22(B)(3) as a felony of the second degree, R.C. 2919.22(B)(3) as a felony of the third degree, and R.C. 2919.22(A) as a felony of the third degree.

{¶ 42} However, while Cantrell was found guilty on these three other counts of endangering children, all three counts were merged into count one, and Cantrell was not sentenced on the merged counts. Without a sentence, a conviction does not exist. *State v. Turner*, 2019-Ohio-144, ¶ 22 (2d Dist.), citing *State v. Croom*, 2013-Ohio-5682, ¶ 59 (7th Dist.), citing *State v. Whitfield*, 2010-Ohio-2, ¶ 12. Because these three endangering children counts were merged for purposes of sentencing, we need not address Cantrell's arguments regarding the sufficiency or manifest weight of the evidence as to these counts. *Id*.; *See also State v. Turner*, 2023-Ohio-2248, ¶ 81 (6th Dist.); *State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th Dist.) ("When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless."); *State v. Croom*, 2013-Ohio-5682, ¶ 59 (7th Dist.) ("where a disputed offense was merged with a greater offense, there is no conviction to vacate on appeal."); *State v. Obsaint*, 2007-Ohio-2661, ¶ 24 (1st Dist.) ("Obsaint was found guilty of aggravated robbery and robbery. However, the robbery count was merged into the aggravated robbery count for purposes of sentencing. . . . Therefore, Obsaint was not convicted of robbery and any error involved in finding him guilty on the second count was harmless as a matter of law."); *State v. Powell*, 49 Ohio St.3d

255, 263 (1990). Any error in the jury's guilty verdicts surrounding these three counts, if found, would be harmless.

{¶ 43} Regardless, upon review of all the evidence, we conclude that the verdicts for these three counts are also based on sufficient evidence and are not against the manifest weight. Endangering children under counts two and three require corporal punishment or physical discipline that is excessive under the circumstances and creates a substantial risk of serious physical harm or actual serious physical harm. While Ohio law recognizes a parent's right to administer reasonable corporal punishment to his child, it prohibits any person from abusing or administering excessive corporal punishment in disciplining a child. *State v. Suchomski*, 58 Ohio St.3d 74, 75 (1991); R.C. 2919.22(B)(1) and (3). Any person that abuses or administers unreasonable or excessive corporal punishment to a child that results in serious physical harm or creates a substantial risk of serious physical harm, commits an act of endangering children. R.C. 2919.22(B)(3).

{¶ 44} We have previously concluded that the act of hitting a child with a belt multiple times for being disobedient or disrespectful is excessive and constitutes corporal punishment that creates a substantial risk of serious physical harm. *State v. Cantrell*, 2024-Ohio-5604, ¶ 43 (2d Dist.) ("The blows to S.M.'s backside with the metal studded belt created a risk of serious physical harm and substantial pain, having a residual effect of requiring medical care."); *See also K.A. v. A.V.*, 2018-Ohio-4144 (2d Dist.) (father whipped eight-year-old son multiple times with a belt leaving bruises and making it difficult to sit for weeks later was excessive corporal punishment). Other courts have likewise held the same in similar circumstances. *State v. Neal*, 2015-Ohio-5452 (4th Dist.) ("The presence of welt marks, along with the extensive bruising across the child's back and buttocks, suggest that appellants hit the child with substantial force. Using substantial force to hit a six-year-old

child with a belt almost certainly creates a substantial risk that the child would suffer prolonged or intractable pain. We cannot imagine that the child did not experience significant pain during the beating."); *State v. Gray*, 2005-Ohio-3861 (6th Dist.) (affirming an endangering children conviction under R.C. 2919.22(B)(3) when appellant struck boys on arms, shoulders, and backs with an object that had metal prongs at one end.); *In re Horton*, 2004-Ohio-6249, ¶ 27 (10th Dist.) (concluding that whipping child with a belt created a substantial risk of serious physical harm when evidence showed child sustained "very deep" and "very red" bruises with pain that lasted from three to seven days).

{¶ 45} As for endangering children in count four, that count only required that Cantrell recklessly create a substantial risk to the health or safety of S.M. For the reasons that we have concluded there is sufficient evidence that Cantrell's conduct created a substantial risk of serious physical harm to S.M., we conclude that same conduct recklessly created a substantial risk to the health or safety of S.M. As we have determined, Cantrell's conduct did result in serious physical harm to S.M.

{¶ 46} In sum, though Cantrell was not convicted on these additional three counts of endangering children, on our review, these three counts are supported by sufficient evidence, and we cannot conclude that the jury's verdicts are against the manifest weight of the evidence. Cantrell's first and second assignments of error are overruled.

**IV. Denial of Cantrell's Motion to Continue the Trial**

{¶ 47} In his third assignment of error, Cantrell argues that the trial court abused its discretion when it denied his motion to continue the trial.

{¶ 48} In evaluating a motion for a continuance, a court should consider several factors, including "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the

21

court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." *State v. Unger*, 67 Ohio St.2d 65, 67-68 (1981).

{¶ 49} "The grant or denial of a continuance is a matter that is entrusted to the broad, sound discretion of the trial judge." *Id*. at syllabus. A trial court's decision on a motion to continue will not be reversed unless the court abused its discretion. *Id*. at 67. An ""abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable.'" *Cantrell*, 2024-Ohio-5406 at ¶ 23 (2d Dist.), quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). Where a defendant fails to show how the denial of the motion to continue prejudiced his defense at trial, an abuse of discretion is not shown. *State v. Myers*, 2018-Ohio-1903.

{¶ 50} Upon review, although we cannot conclude that Cantrell's request for continuance was dilatory, purposeful, or contrived, it appears that he had counsel appointed, but he retained new counsel approximately 20 days before trial. Regardless, Cantrell did not specify the length of the delay requested in his motion, and the court had previously granted him a continuance. In fact, the trial court advised Cantrell in its April 5 entry that no additional continuances would be granted for the trial. Moreover, any further delay would have inconvenienced litigants, witnesses, and opposing counsel, as several witnesses had been subpoenaed to testify by the time new counsel entered an appearance.

{¶ 51} The incident in question occurred in October 2021 and Cantrell was indicted shortly thereafter. The original trial was continued from July 2022 to February 2023. The second trial was scheduled in August 2023, nearly two years after the events that gave rise to the charges against Cantrell. Moreover, the record shows that despite having been

22

retained approximately 20 days before trial, counsel was prepared for trial. The record of the trial demonstrates that counsel conducted cross-examinations and called a witness for Cantrell's defense. Cantrell has not demonstrated prejudice to his defense by failing to grant the continuance. Under all of the circumstances, we cannot say that the trial court abused its discretion in denying Cantrell's additional motion for a continuance. Thus, Cantrell's third assignment of error is overruled.

### V. Conclusion

{¶ 52} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.